UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:10-cv-00439-FDW-DCK

| | | |
|---|---|---|
| **LENDINGTREE, LLC, a Delaware limited liability company,** | ) ) | |
| **Plaintiff,** | ) ) ) | |
| **vs.** | ) ) | ORDER |
| **ZILLOW, INC., a Washington corporation; NEXTAG, INC., a Delaware corporation; and ADCHEMY, INC., a Delaware corporation,** | ) ) ) ) | |
| **Defendants.** | ) ) ) | |

THIS MATTER is before the Court on the issue of whether the equitable defenses of laches should apply in this case to bar the recovery of any pre-filing damages for infringement that NexTag might owe LendingTree and whether LendingTree should be equitably estopped from obtaining any relief on its infringement claims against NexTag.[1] In addition to conducting a separate bench trial on this issue, the Court also considered evidence on laches and equitable estoppel concurrently with the jury trial on infringement, invalidity, and damages. The Court has thoroughly reviewed the evidence, arguments (including those made on summary judgment), and the record in this case. Accordingly, this matter is ripe for decision. For the reasons stated herein and on the record, the Court finds that the doctrine of laches and equitable estoppel should apply to LendingTree's claims against Defendant NexTag in this case.

FINDINGS OF FACT – LACHES

---

[1] The Court notes that a jury has already determined that NexTag did not infringe LendingTree's patents-in-suit. (Doc. No. 565). The jury also found LendingTree's patents to be invalid. Id. Nevertheless, in light of the possibility of an appeal in this matter on the jury's verdict, the Court is compelled to rule on the laches and equitable estoppel defenses raised by NexTag.

1.  LendingTree sued NexTag for infringement of U.S. Patent No. 6,611,816 on September 8, 2010.

2.  All parties agree that the Laches Critical Date is September 8, 2004.

3.  LendingTree documents evidence top-to-bottom corporate knowledge of NexTag's accused system well before the Laches Critical Date. These documents begin at least as early as May 2003 and run throughout the pre-Critical Date period, including documents and correspondence sent and received by nearly every corporate executive within LendingTree's organizational structure. These corporate executives included, among others, LendingTree's Founder and Chief Executive Officer Doug Lebda (DX1302), its Chief Operating Officer Tom Reddin (DX1308), its Chief Marketing Officer Bob Harris (DX1308), its General Counsel Bob Flemma (DX1293), its Assistant General Counsel charged with intellectual property enforcement, Debra Ashley (DX1293), six Senior Vice Presidents (DX1287, DX1293, DX1294, DX1299, DX1302), nine Vice Presidents (DX1277, DX1284, DX1287, DX1288, DX1294, DX1296, DX1299), seven Senior Directors and various other managers and directors within nearly all divisions of LendingTree. *See generally* DX1269-DX1333.

4.  LendingTree's own customers repeatedly sent detailed information about the accused NexTag service and website, including NexTag presentations and advertisements, and nextag.com screen shots prior to the Laches Critical Date. *See, e.g.*, DX1269, DX1278, DX1284, DX1287, DX1322, DX1330, DX1270, DX1279, DX1288, DX1291, DX1311 and DX1317.

5.  For example, on May 5, 2003, LendingTree received – from a LendingTree customer –

NexTag's "Mortgage Lead Program" presentation, which NexTag had pitched to LendingTree's customer. This presentation includes website screenshots of NexTag's Mortgage Lead System and "selection criteria" (property location, etc.). DX1279.

6.  Similarly, on August 12, 2003 LendingTree received – from a LendingTree customer – NexTag's "Mortgage Overview" presentation to Prime, a "residential mortgage lender." DX1278. This document included NexTag's email sales pitch to Prime, stating "Unlike LendingTree, we do not charge any setup or back-end closing costs. We generate four–five times more unique user traffic than Lending Tree or GetSmart . . . ." This presentation also shows screens shots of the qualification form and the "selection criteria" (property location, etc.) (emphasis in original).

7.  LendingTree's clients informed LendingTree of NexTag's system on numerous occasions, forwarding screenshots of the NexTag Mortgage Lead System to LendingTree employees. In one instance, high-ranking LendingTree executives, including Gary Silverstein and Jeff Lyons, noted on October 1, 2003 that "[a]lot [sic] of lenders said they purchased leads from NexTag." DX1287.

8.  On November 3, 2003, i.e. 10 months before the Laches Critical Date, Coldwell Banker forwarded to LendingTree a NexTag email wherein NexTag stated that "[w]e currently generate a few thousand mortgage leads a day . . . ." DX1293. These reports traveled throughout the LendingTree organizational structure. *See, e.g.*, DX1293, DX1296 and DX1299.

9.  By November 7, 2003, these reports reached Doug Lebda, the CEO of LendingTree, noting that "[s]ome bankers ... told me that mortgages were becoming a large part of [NexTag's]

3

business."). DX1305. Lebda was informed that NexTag was selling mortgage leads to eTrade and Home Loan Center. *Id.*

10. LendingTree later purchased Home Loan Center in 2004. DX1500.

11. LendingTree actually tracked and studied NexTag's mortgage lending website. LendingTree officials at the highest levels shared this information. *See, e.g.*, DX1273, DX1274, DX1302, DX1303, DX1306, DX1309, DX1316, DX1320, DX1324.

12. Beginning in 2003, LendingTree believed NexTag offered a service "just like" LendingTree. *See, e.g.*, DX1288, DX1308.

13. By September 22, 2003, in efforts to "ramp up [its] following of smaller competitors," including NexTag, LendingTree initiated "a competition report," which included a link to and copies of NexTag's accused mortgage RFQ form. DX1284.

14. That same date, LendingTree executives passed around a link to NexTag's Mortgage Lead System, noting "[n]ot sure if you knew [NexTag] sold leads directly." DX1287.

15. Prior to the Critical Date, LendingTree personnel circulated links to, and screenshots of, NexTag's Mortgage Lead System. *See, e.g.*, DX1269, DX1278, DX1284, DX1287, DX1322, DX1330, DX1270, DX1279, DX1288, DX1291, DX1311 and DX1317.

16. On September 22, 2003, three LendingTree Vice Presidents exchanged emails containing a link to NexTag's Mortgage Lead System. DX1284.

17. Links were also included in a LendingTree email sent on October 1, 2003. DX1287.

18. LendingTree's General Counsel was made aware of NexTag's Mortgage Lead System by October 27, 2003. DX1350. LendingTree personnel reported to the General Counsel that "[w]e may want to watch out for this company it appears they're a pretty close rip-off of

4

both of LT business models." The same email chain noted that NexTag "ha[d] already borrowed our business model from the mortgage side – fill out one form and get matched with up to four lenders[2]." LendingTree's General Counsel responded "o.k." to the suggestion of watching out for NexTag, while copying Debra A. Ashley, LendingTree's Assistant General Counsel charged with intellectual property enforcement and Chris Cox, LendingTree's Intellectual Property Program Coordinator.[3] DX1350.

19.    Within two months, i.e., on December 18, 2003, LendingTree created a so-called "Saint Lee Compliance Checklist" regarding the accused NexTag system. The checklist contained detailed information about the NexTag Mortgage Lead System, including a reference to the following attributes of the NexTag service:   "applicants are referred to up to 4 lenders," "Information will be disclosed to Lenders (participating banks, mortgage brokers, loan brokers, financial institutions, and in some cases aggregators)," "NexTag operates the site," "[t]he site begins displaying the [Equal Housing Opportunity] logo on the first page of the loan request form," along with a list of states in which NexTag was or was not licensed as a mortgage broker. DX1312.

20.    Throughout the 2003-2004 timeframe, LendingTree continued to lose customers and market share to NexTag's Mortgage Lead System. *See, e.g.*, DX1270, DX1284, DX1285, DX1287, DX1294, DX1297, DX1300, DX1303, DX1305, DX1306, DX1309, DX1314, DX1319, DX1320, DX1323, DX1324, DX1327, DX1328, DX1332.

---

[2] Mr. Lebda testified at trial that any competitor who allowed a lead to fill out a form and then would use that information on the form to match the lead with lenders infringed his patent. Trial Tr. 4318:13-4319:21.

[3] LendingTree produced this document in response to Magistrate Judge Keesler's Order Granting NexTag's Motion to Compel Production of Documents Subject to Waiver of Privilege. The Order compelled LendingTree to produce documents showing: (i) when did LendingTree's inside counsel advise LendingTree management or give LendingTree management reason to believe that NexTag's allegedly infringing product existed; (ii) whether LendingTree employees supplied any information to LendingTree's inside counsel relevant to that determination; (iii) the specifics of that information; and (iv) when it was supplied.

21. For example, on August 26, 2003, a mortgage broker emailed LendingTree informing LendingTree that, due to LendingTree's low mortgage lead volume, the mortgage broker was reassigning loan officers to handle NexTag mortgage leads. DX1281.

22. Similarly, on March 15, 2004, Flagstar Bank, a former LendingTree customer forwarded to LendingTree NexTag's "Mortgage Overview" presentation. In its email to LendingTree, Flagstar stated, "As a consequence of the trail-off in refi leads from LendingTree . . . . I'd like to give this company [NexTag] a shot at providing us with an alternative." DX1270. Flagstar included the agreement signed between NexTag and Flagstar for NexTag to serve as Flagstar's mortgage lead provider. *Id.* This agreement showed, among other things, the lead criteria NexTag would use to determine leads to be sent to Flagstar. *Id.*

23. On July 28, 2004, Nationwide Lending, a mortgage broker and LendingTree customer, informed Mr. Lebda that NexTag "opened the flood gates" for mortgage leads. Mr. Lebda responded, stating that he would "refrain from commenting about how [NexTag] can turn up volume to allocate to certain lenders…." DX1327.

24. LendingTree's internal emails conclusively demonstrate that LendingTree not only knew of NexTag's Mortgage Lead System but also that LendingTree was investigating the details of that system and how it matched up with LendingTree's own system. *See, e.g.*, DX1273, DX1279, DX1284, DX1285, DX1306, DX1309 and DX1312.

25. For example, a May 19, 2004, internal email included "some info on how they [NexTag] work . . . *They're just like us*." DX1288 (emphasis added).

26. Various LendingTree personnel circulated screen shots of NexTag's Mortgage Lead System, including, at least, emails sent February 12, 2004 (DX1322), March 15, 2004

(DX1270), May 12, 2004 (DX1279), June 3, 2004 (DX1311 and DX1313), June 7, 2004 (DX1317), and June 29, 2004 (DX1319). Personnel sending and receiving these screenshots included LendingTree's General Counsel, Assistant General Counsel, Chief Marketing Officer, two Senior Vice Presidents, as well as others.

27. On January 26, 2004, LendingTree compared NexTag's "lender matching" services of providing "up to 4 lenders" to LendingTree's own GetSmart service. DX1316.

28. By February 13, 2004, LendingTree personnel circulated internal emails attaching "competitive survey stuff," including a document called "Mortgage Lead Landscape." The competitive survey provided competitor details, including NexTag "Field/Filter Specifications" and pricing. DX1324.

29. Also in February 2004, LendingTree circulated a survey comparing LendingTree's service with that of NexTag. LendingTree's competitive analysis identified consumer data collected on nextag.com and identified the elements LendingTree later claimed were infringing, such as not collecting a Social Security Number, matching "up to 4 companies," "ask for credit," collecting "name, address, city, state, zip, area code, phone number, email address, borrower credit, borrower gross monthly income, borrower monthly debt, purpose of loan, amount requested, property type" and "filtering." DX1320.

30. LendingTree's internal June 3, 2004, email (i) noted that "NexTag are such a bunch of slime balls!" and (ii) identified the screenshots of the NexTag product as "just about an exact rip off of LendingTree." DX1311, DX1313.

31. That same day, the "slime balls" email was forwarded to LendingTree's General Counsel who arranged to meet with his Assistant General Counsel to discuss its contents. DX1355.

32. Additionally, on June 29, 2004, LendingTree's Chief Marketing Officer forwarded screenshots to the General Counsel, identifying NexTag as a "[m]ajor competitor" and asking if there was "anything we can do from a legal perspective?" DX1319.

33. As another example, DX1274, dated August 13, 2004, attached a comparison of services that discussed NexTag's services. The comparison stated that "NexTag has some filtering capabilities," and also indicated "NexTag . . . handles the transmission of data from NexTag to lending . . . ." Mr. Lebda was emailed a copy of this comparison of services in DX 1274 on August 13, 2004, but concedes that he did not see it at the time.

34. Home Loan Center ("HLC") bought NexTag mortgage leads beginning in 2003. DX1264.

35. LendingTree's HLC purchase diligence evidences knowledge of the accused service before the Laches Critical Date.

36. LendingTree and NexTag were doing business together prior to the Laches Critical Date. During the 2003-2004 period, LendingTree had an affiliate program through which website operators could link to LendingTree's services. LendingTree's affiliate program made identifying potential infringers somewhat difficult because a potential infringer might just be an affiliate using LendingTree's system on the back-end (and thus not an infringer). Some affiliates used LendingTree as a behind-the-scenes back-engine. They would gather information and then pass that information behind-the-scenes to LendingTree. (March 12, 2014 a.m. Tr. at 4191:14-23; Feb. 21, 2014 a.m. Tr. at 1140:14-23.)

37. LendingTree invited NexTag to apply as a marketing affiliate for LendingTree's mortgage and credit products on November 5, 2002. DX1018. The affiliate relationship came about because NexTag sent LendingTree a request for proposal to have a mortgage offering on

NexTag's website. (Feb. 20, 2014 a.m. Tr. at 847:10-848:4.)

38. LendingTree approved NexTag as a Super Affiliate two days later. DX1019. LendingTree expanded its relationship with NexTag on August 31, 2004, by having NexTag transmit real estate leads to a LendingTree subsidiary.

39. Under the agreement signed on August 31, 2004, NexTag agreed to "host certain specified web-based interview pages on behalf of LendingTree and deliver such completed interview pages to LendingTree" referring to nextag.com. Exhibit A to the August 31, 2004, Agreement includes screenshots of the accused service, including "click-through box" for consumers' selection: "Match me with Lenders Now" which linked to NexTag's mortgage inquiry form. LendingTree asserts these exact same forms collect information to satisfy the Patent's "credit data" limitation. Exhibit A to the August 31, 2004, Agreement also includes additional nextag.com screenshots, including its mortgage tab: "Mortgages: Please select the type of mortgage loan."

40. LendingTree acknowledges that it was conducting business with NexTag at least until 2010.

41. In 2003, NexTag implemented the accused system. Trial Tr. 1466:24-1467:9.

42. NexTag spent over a hundred million to advertise the business to attract "traffic" to the accused website to complete loan inquiry forms. Trial Tr. 1465:10-18.

43. The website was open and notorious, and accessible to anyone. Trial Tr. 1467:5-9.

44. The system's general operation did not change during its seven-year operation. Trial Tr. 1565:7-13.

45. LendingTree emails from September 22, 2003, and October 1, 2003, each included a link to

NexTag's Mortgage Lead System on the website www.nextag.com. These links show that the accused product was open and notorious on the Internet prior to the Laches Critical Date. DX1284, DX1287.

46. LendingTree admits it knew of nextag.com and bought mortgage advertisements prior to the Laches Critical Date:

> LendingTree first became aware of the existence of NexTag's website for advertising purposes in or around January 2004 ….
> *****
> In addition, from January 2004 through January 2005 LendingTree LLC paid to place advertisements relating to mortgages on NexTag's website.

DX1345 at 41-43 (LendingTree First and Second Supplemental Responses to Interrogatory No. 7).

47. LendingTree admits it knew of www.nextag.com and bought mortgage advertisements prior to the Laches Critical Date. Over six years later, LendingTree used the ***same*** public information to prepare infringement contentions—"based entirely on its review and analysis of public information"—against NexTag's service "that matched prospective borrowers with one or more lenders via the Internet." DX1350; *see also* Trial Tr. 1155:15-17; 1278:13-1280:4 (Ashley Cross)

48. LendingTree's duty to preserve evidence arose at least by October 6, 2004, when it admits it knew it had a claim.

49. LendingTree violated its duty to preserve evidence, failing to take any steps to preserve evidence until suit was filed in 2010. DX1345 at 106-08 (LendingTree Response to Interrogatory No. 24); Trial Tr. 2064:23-2065:2.

50. Mr. Lebda testified that no litigation holds were necessary because of LendingTree's

backup tape system. Trial Tr. 2061:10-2065:2.

51. LendingTree initially refused to produce any documents from backup tapes despite its failure to properly institute a litigation hold regarding NexTag and despite that it admitted its backup tapes relieved it of having to initiate a formal litigation hold. Trial Tr. 2061:10-2065:2. *See* Dkt. No. 268.

52. LendingTree only restored documents from a subset of its backup tapes—namely a subset of tapes from 2003-2005—following a sanction order from the Court and a fine levied directly against LendingTree's counsel. *See* Dkt. Nos. 336, 346.

53. Due to LendingTree's failure to preserve discoverable information and its steadfast resistance to the restoration of its backup tapes, numerous material LendingTree documents were not recovered until after the close of discovery and could not be used for refreshing witness memories or cross-examination. *Id.*

54. The restoration—limited to a single search term, "NexTag"—probably did not capture all relevant documents that would otherwise have been available. *See* Dkt. No. 268.

55. Custodian searches could not be performed. *See* Dkt. Nos. 268, 336, 346.

56. Paper documents not captured by auto-backup systems were irretrievably lost. Trial Tr. 4421:5-6 (Hon. F. Whitney) (acknowledging "The backup tapes don't capture handwritten documents or certain files.")

57. LendingTree contends in response to NexTag's Interrogatory 7 that:

> The existence of NexTag's infringing system was brought to the attention of Douglas Lebda by counsel for LendingTree on or around October 6, 2004. The communications with counsel related to when NexTag first became aware of the infringing NexTag system are protected by the attorney–client privilege and/or attorney work product doctrine and/or any other applicable privilege or immunity.

DX1345 at 41-43 (LendingTree First and Second Supplemental Responses to Interrogatory No. 7).

58. The attorney work product doctrine protects from discovery documents prepared in anticipation of litigation or for trial. In asserting attorney work product privilege to documents from as early as October 6, 2004, LendingTree reasonably anticipated litigation against NexTag by that date.

59. Yet, LendingTree admitted that it did not initiate a document hold until the initiation of the suit, some six years later. DX1345 at 106-09. LendingTree Response to Interrogatory No. 24.

60. LendingTree had a duty to preserve evidence relevant to this litigation at least as early as October 6, 2004, when it was informed by counsel of the "existence of NexTag's infringing system." DX1345 at 41-43 (LendingTree First and Second Supplemental Responses to Interrogatory No. 7).

61. LendingTree, however, did not institute a document-preservation policy until "the onset of this litigation." DX1345 at 106-109 (LendingTree Response to Interrogatory No. 24); Trial Tr. 2061:10-2065:2.

62. LendingTree's 30(b)(6) designee on document collection and production, Mr. Lebda, likewise testified that he does not recall receiving any document preservation notice around the time when LendingTree sent NexTag the October 2005 licensing invitation letter. DX511 at 291-94; Trial Tr. 2061:10-2065:2. LendingTree, in fact, failed to preserve and produce this critical October 2005 letter.

Laches is "an equitable defense to a claim for patent infringement." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992). "In a legal context, laches may be defined as: the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *Id.* at 1028-29. The Court weighs "the length of delay, the seriousness of prejudice, the reasonableness of excuses, and the defendant's conduct or culpability." *Id.* at 1034. "The period of delay is measured from the time the plaintiff knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." *Id.* at 1032. Under Federal Circuit precedent, the period of delay may not begin prior to the issuance of the patent. *See id.* The issuance of a patent establishes only the maximum period of delay. The actual period of delay begins when the patentee "knew or reasonably should have known of the defendant's alleged infringing activities to the date of suit." *Id.* "The reasonableness of the behavior of the person against whom laches is asserted depends on the facts of the particular case." *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1162 (Fed. Cir. 1993).

Application of laches does not require legal analysis of the accused product. "It is well-settled that the knowledge relevant to the laches inquiry is the plaintiff's knowledge of the facts and features of the accused product that form his infringement allegation. Knowledge as to whether the device itself actually infringe[d] one's patent is not required to establish laches." *Thomas v. Echostar Satellite LLC*, 2006 U.S. Dist. LEXIS 91748, at *15 (W.D.N.C. Dec. 19,

2006) (citing *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1391 (Fed. Cir. 1995)); *id.* ("It is settled that the laches period begins when the plaintiff discovers the facts which create his right or cause of action . . . . Even if Dr. Coleman did not know whether the Corvac was technically an 'infringement'. . . he knew all the facts concerning the Corvac project.").

"[C]ourts impose a duty on patentees to police their patent rights and will impose constructive knowledge based on the required reasonable, diligent inquiry." *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 679 F. Supp. 2d 512, 520 (D. Del. 2010). "A patentee must investigate 'pervasive, open, and notorious activities' that a reasonable patentee would suspect were infringing. For example, sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention . . . give rise to a duty to investigate whether there is infringement. *Id.* (quoting *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998)). "[C]onstructive knowledge of the infringement may be imputed to the patentee even where he has no actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor." *Wanlass*, 148 F.3d at 1338.

"A delay of more than six years raises a presumption that it is unreasonable, inexcusable, and prejudicial." *See id.* at 1337. "Where the presumption is established, the burden shifts to the patentee to produce sufficient evidence to 'put the existence of a presumed fact into genuine dispute' with regard to the reasonableness of the delay or the alleged prejudice." *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc*., No. 07 Civ. 127, 2014 WL 533425, at *7 (D. Del. Feb. 7, 2014) (quoting *Aukerman*, 960 F.3d at 1038). If the patentee fails to come "forward with either affirmative evidence of a lack of prejudice or a legally cognizable excuse for its delay in

filing suit, the two facts of unreasonable delay and prejudice '*must* be inferred.'" *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553–54 (Fed. Cir. 1996) (emphasis in original) (quoting *Aukerman*, 960 F.2d at 1037).  But if the patentee raises sufficient evidence to challenge the presumption, the defendant "is left to its proof" or "actual evidence." *Aukerman*, 960 F.2d at 1037-38.  Whether the presumption applies or is rebutted, the "defendant bears the ultimate burden of persuasion [which] does not shift by reason of the patentee's six-year delay." *Id.* at 1038-39.

"A court must consider and weigh any justification offered by the plaintiff for its delay." *Id.* at 1033.  Excuses that have been recognized in certain instances include: "other litigation; negotiations with the accused defendant; possibly poverty and illness in limited circumstances; wartime conditions; extent of infringement; and dispute over ownership of the patent." *FMC Corp. v. Guthery*, No. 07 Civ. 5409, 2009 WL 1033663, at *4 (D.N.J. Apr. 17. 2009) (citing *Aukerman*, 960 F.2d at 1033).  The Federal Circuit has "affirmed findings of unreasonableness for delays of less than six years." *Meyers v. Asics Corp.*, 974 F.2d 1304, 1307 (Fed. Cir. 1992) (collecting cases).  "The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances." *Aukerman*, 960 F.2d at 1032 (citing *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892); *Rosemount, Inc. v. Beckman Instruments*, 727 F.2d 1540, 1550 (Fed. Cir. 1984) (patentee denied damages because of a three-year delay)).

Prejudice can take the form of either economic or evidentiary prejudice.  *See Aukerman*, 960 F.2d at 1033.  "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's

ability to judge the facts. *Id.* (citing *Barrois v. Nelda Faye, Inc.*, 597 F.2d 881, 885 (5th Cir. 1979); *Smith v. Sinclair Ref. Co.*, 257 F.2d 328, 330 (2d Cir. 1958); *Gillons v. Shell Co.*, 86 F.2d 600, 608-09 (9th Cir. 1936), cert. denied, 302 U.S. 689 (1937); VI Restatement Law of Torts § 939 (1936)).

Economic prejudice arises when "a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit. *Aukerman*, 960 F.2d at 1033. Courts "look for a *change* in the economic position of the alleged infringer during the period of delay." *Id.*

For economic prejudice, "[t]he change must be because of and as a result of the delay." *Hemstreet v. Computer Entry Sys. Corp.,* 972 F.2d 1290, 1294 (Fed. Cir. 1992). *Accord ABB Robotics*, 52 F.3d at 1065 ("[C]ases in which economic prejudice has been found lacking did not so hold because of a lack of capital investments, but, rather, because the alleged infringer failed to prove that their increased expenditures, i.e., on marketing and development, were in any way related to actions taken by the patentee."). Courts have found that a patentee's delay in bringing a suit can cause prejudice by "depriv[ing] [the alleged infringer] of the opportunity to modify its business strategies." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, No. 10 Civ. 122, 2013 WL 3776173, at *7 (W.D. Ky. July 16, 2013). *Accord Lautzenhiser Tech. LLC v. Sunrise Med. HHG, Inc*., 752 F. Supp. 2d 988, 1004 (S.D. Ind. 2010) ("If [plaintiff] had sued earlier, Defendants likely never would have expended time and money to [develop the allegedly infringing products]. What is more, common sense suggests that Defendants would have modified their business strategies if they came under suit for infringement."). Courts have also found that "[m]aking heavy capital investment and increasing production can constitute

prejudice" when those investments are causally connected to plaintiff's delay. *Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990). *Accord Technology for Energy Corp. v. Computational Sys., Inc.*, Nos. 92-1542 and 92-1551, 1993 WL 366350, at *7-8 (Fed. Cir. Sept. 21, 1993) (finding economic prejudice where defendant expanded its business, including employees, sales, and research and development).

"[T]he establishment of the factors of undue delay and prejudice, whether by actual proof or by the presumption, does not mandate recognition of a laches defense in every case. . . . Those factors merely lay the foundation for the trial court's exercise of discretion." *Aukerman*, 960 F.3d at 1036. The court "must weigh all pertinent facts and equities in making a decision on the laches defense." *Id.* at 1034. "Where there is evidence of other factors which would make it inequitable to recognize the defense despite undue delay and prejudice, the defense may be denied." *Id.* at 1036.

The Court hereby makes the following conclusions of law regarding the NexTag's laches defense.

63. LendingTree sued NexTag on September 8, 2010. Dkt. No. 1. The facts show that, well beyond a preponderance of evidence, LendingTree knew or should have known of its claims against NexTag prior to September 8, 2004.

64. The unrebutted facts show that, in fact, LendingTree knew or should have known of NexTag's alleged infringing activity prior to the issuance of the '816 Patent on August 26, 2003. *See, e.g.,* DX1269, DX1272, DX1275, DX1278, DX1281.

65. Since NexTag has shown clear knowledge of the accused product before Sept. 8, 2004, the presumption of unreasonable, inexcusable, and prejudicial delay attaches.

66. Prior to filing suit, LendingTree made no effort at all to inform NexTag of potential infringement issues with regard to the '816 Patent, and the delay in this case is well over six years. Trial. Tr. 1534:7-1541:16.

67. LendingTree has not rebutted the presumption that the delay was unreasonable.

68. Among others, NexTag has suffered evidentiary prejudice through the loss of documents, faded memories, the death of an inventor and the inaccessibility of witnesses during discovery and at trial.

69. NexTag also suffered economic prejudice. During the period of inexcusable delay, it invested in the accused product, directed sales of mortgage leads to LendingTree and lost the ability to timely design around the '816 Patent. In addition, it was deprived of the ability to prevail against LendingTree's now rejected infringement claims earlier, license the technology, negotiate a settlement, and/or explore other non-infringing alternatives.

70. LendingTree has failed to rebut (i) the loss of evidence and (ii) NexTag's economic prejudice.

71. Even if LendingTree were able to rebut the presumption of laches—and the Court concludes it cannot—this Court would still find that the balance of equities would require the application of laches in this case.

72. LendingTree's duty to preserve evidence arose no later than October 6, 2004, when it admits it knew it had a claim. *Zubulale v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.")

73. LendingTree's duty to preserve evidence arose no later than its assertion of the attorney work product privilege. *See, e.g., Siani v. State Univ. of N.Y.*, No. C09-407 (JFB)(WDW), 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010) ("If it was reasonably foreseeable for work product purposes, Siani argues, it was reasonably foreseeable for duty to preserve purposes. The court agrees."); *Sanofi-aventis Deutschland GmbH v. Glenmark Pharms. Inc.*, USA, No. 07-CV-5855, 2010 WL 2652412, at *5 (D.N.J. Jul. 1, 2010) (holding that the defendants' duty to impose a litigation hold and institute legal monitoring for purposes of complying with the duty to preserve arose no later than the date on which the defendants began withholding documents as protected by the work-product doctrine because "'[a] party claiming work-product immunity bears the burden of showing that the materials in question 'were prepared in the course of preparation for possible litigation.''" (quoting *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 138 (3d Cir. 2000))); *Anderson v. Sotheby's Inc. Severance Plan*, No. 04 Civ. 8180(SAS), 2005 WL 2583715, at *4 (S.D.N.Y. Oct. 11, 2005) (date of documents claimed to be protected by work product triggered the duty to preserve even though the documents were ultimately determined not to be protected by work product)

74. LendingTree documents evidence top-to-bottom corporate knowledge of NexTag's accused system before the Laches Critical Date. *See, e.g.,* DX1269-DX1333, DX1350-1359. These documents begin in May 2003 and run throughout the pre-Critical Date period, including documents and correspondence sent and received by nearly every corporate executive within LendingTree's organizational structure. *See id.* These corporate executives included, among others, LendingTree's Founder and Chief Executive Officer, Doug Lebda

(DX1302), its Chief Operating Officer Tom Reddin (DX1308), its Chief Marketing Officer Bob Harris (DX1308), its General Counsel Bob Flemma (DX1293), its Assistant General Counsel charged with intellectual property enforcement, Debra Ashley (DX1293), six Senior Vice Presidents (DX1287, DX1293, DX1294, DX1299, DX1302), nine Vice Presidents (DX1277, DX1284, DX1287, DX1288, DX1294, DX1296, DX1299), seven Senior Directors and various other managers and directors within nearly all divisions of LendingTree. *See generally* DX1269-DX1333.

75. Customers repeatedly sent detailed information about the accused NexTag service and website, including NexTag presentations and advertisements, and nextag.com screen shots prior to the Laches Critical Date. At least on May 5, 2003, LendingTree received NexTag's "Mortgage Lead Program" presentation. It shows screens shots of the Mortgage Lead System and "selection criteria" (property location, etc.). *See, e.g.*, DX1269, DX1278, DX1284, DX1287, DX1322, DX1330, DX1270, DX1279, DX1288, DX1291, DX1311 and DX1317.

76. Back in the 2003-2004 period, LendingTree followed a process for identifying potential patent infringers. This process effectively required information about a potential infringer to come to the attention of LendingTree's president, Douglas Lebda and those advising the company with respect to its intellectual property matters. Several high level employees that LendingTree had back in 2003-2004, including Mr. Lebda, General Counsel Bob Flemma, aassistant general counsel Debra Ashley, and intellectual property program coordinator Chris Cox were sufficiently familiar with LendingTree's '816 patent to identify a potential infringement. (March 12, 2014 a.m. Tr. at 4190:23-4191:23.)

77. On October 27, 2003, LendingTree General Counsel Bob Flemma received a notification from senior LendingTree employees informing him that NexTag was "rip[ping] off" LendingTree's business model – "fill out one form and get matched with up to four lenders." LendingTree personnel reported to the General Counsel that "[w]e may want to watch out for this company it appears they're a pretty close rip-off of both of LT business models." DX1350. The same email chain noted that NexTag "ha[d] already borrowed our business model from the mortgage side – fill out one form and get matched with up to four lenders." *Id.* LendingTree's General Counsel responded "o.k." to the suggestion of watching out for NexTag, while copying Debra A. Ashley, LendingTree's Assistant General Counsel in charge of intellectual property enforcement and Chris Cox, LendingTree's Intellectual Property Program Coordinator. *Id.* LendingTree witnesses confirmed that Debra A. Ashley and Chris Cox were in charge of LendingTree's patent enforcement efforts. Trial Tr. 1132:7-11 (Ashley Cross); 1133:10-22 (Ashley Cross); 1779:2-1780:17 (Lebda Cross); 2046:18-2047:1 (Lebda Cross).

78. The '816 Patent – the only patent asserted against NexTag – is a continuation the '594 patent and has the same specification and figures.

79. Section 120 of Title 35 of the United States Code allows a patentee to file a continuation application that will receive the same priority date as the original patent application but can include new claims.

80. Although the claims in the two LendingTree patents at issue are different, the patent specifications and the drawings are otherwise the same.

81. While continuation patents can add new claims, because those claims are based on the

disclosures in the parent application, those claims could have been made in parent application.

82. "The law on laches is rooted in the equitable principle that courts will not assist one who has slept on his rights." *Crown Packaging*, 679 F. Supp. 2d at 519 (marks omitted). *Accord Lane & Bodley Co. v. Locke,* 150 U.S. 193, 201 (1893) ("Courts of equity, it has often been said, will not assist one who has slept upon his rights, and shows no excuse for his laches in asserting them.").

83. In light of this maxim, the laches period for continuation patents starts with the issuance of the original patent. *See Medinol Ltd. v. Cordis Corp.*, 13-Civ-1408, 2014 WL 1041362, at *9 (S.D.N.Y. March 14, 2014) ("In light of [*Crown Packaging*], it makes sense to consider the laches period for continuation patents to start with the issuance of the original patent."); *Teradyne, Inc. v. Hewlett-Packard Co.*, No. 91 Civ. 0344, 1994 WL 327213, at *8 (N.D. Cal. June 24, 1994) (holding that the laches period for reissue patents should begin at the issuance of the original patent).

84. Mr. Lebda testified that he actually became aware of a potential infringement claim after October 6, 2004. Trial Tr. 4323:11-4324:17 (Lebda Cross). Despite this testimony, the evidence shows Mr. Lebda received email correspondence well before October 6, 2004, that should have alerted him to a potential infringement claim. See e.g., DX1274. Furthermore, when Mr. Lebda became aware of an infringement claim against NexTag is not dispositive of when *LendingTree* knew or should have known of NexTag's allegedly infringing activity. Rather, the knowledge of other employees besides Mr. Lebda can be and is imputed to LendingTree.

85. LendingTree made a tactical decision not to sue NexTag because of business considerations, not because it was unaware of NexTag's allegedly infringing activity. Trial Tr.1309:15-1310:14 (Ashley Direct).[4]

86. LendingTree had constructive, if not actual, knowledge of the potential infringement at the time that LendingTree received a NexTag Mortgage Lead Program presentation on May 5, 2003. This presentation contained screenshots of the accused system. DX1369.

87. Those screenshots were identical to screenshots used by Mr. Cox in October 2004 to perform an infringement analysis of the NexTag system that concluded that LendingTree had "sufficient evidence" of NexTag's infringement and thus "outside counsel should be contacted," presumably to pursue an infringement suit against NexTag. DX12699, PTX995; Trial Tr. 4387:25-4388:15 (Lebda Cross).

88. Even if this May 5, 2003, presentation was insufficient, standing alone, to provide constructive, if not actual, knowledge of NexTag's potential infringement, the ongoing internal communications among high-level LendingTree employees, which are discussed above, demonstrate an increased knowledge of NexTag's potentially infringing system. LendingTree failed to follow up on these continuing indicators of potential infringement until almost a year and a half after receiving the May 5, 2003, presentation. When asked by the Court "whose fault is it that this very important email of October 27, 2003, didn't get any attention," LendingTree's former assistant general counsel Ms. Ashley answered, "I think as between the parties that would be LendingTree." (Trial Tr. 1304).

---

[4] The Court notes that LendingTree states that in at least late 2009, LendingTree reasonably did not feel it appropriate to sue NexTag while the two companies were discussing a potential acquisition. (Doc. No. 568, p. 16). Although the statement concerns LendingTree's intentions at later period in time; nevertheless, it is indicative of the fact that an ongoing business relationship with NexTag likely factored into LendingTree's tactical decision not to sue NexTag in 2003.

89. Applying the analysis above regarding the issuance date of the original, '594 Patent, LendingTree's date of first knowledge is at least May 5, 2003 – the date LendingTree received a NexTag presentation that NexTag provided to a LendingTree customer (DX1269). This is significantly longer than the presumptively unreasonable six years. The period of delay for claims against NexTag is 7 years, 4 months and 3 days.

90. LendingTree knew or should have known of NexTag's allegedly infringing activity prior to the issuance of the '816 Patent. The '816 Patent issued on August 26, 2003, 7 years and 13 days before LendingTree filed suit. PTX2.

91. "[A] reasonable patentee, motivated by his interest in recovering for and preventing infringement, keeps abreast of the activities of those in his field of endeavor." *Wanlass*, 148 F.3d at 1339; *Rockwell Int'l Corp. v. SDL, Inc.*, 103 F. Supp. 2d 1192, 1199 (N.D. Cal. 2000) ("[C]ase law charges plaintiff with such knowledge as it might have obtained on reasonable, diligent inquiry.").

92. "Allocating the burden to patentees to seek out infringers is proper, furthermore, because compared to potential infringers, they are in a better position to know the scope of their patent protection and, therefore, they are in the best position to know the scope of their patent protection." *Wanlass*, 148 F.3d at 1139.

93. LendingTree knew or should have known about NexTag's potentially infringing product prior to Sept. 8, 2004.

94. These undisputed facts weigh strongly in favor of a presumption of laches.

95. Since NexTag has demonstrated LendingTree's actual knowledge of the accused product before 2004, the presumption of unreasonable, inexcusable, and prejudicial delay attaches.

96. Even if the alleged infringer presents sufficient evidence for the application of the laches presumption, "the patentee may offer proof directed to rebutting the laches factors," which proof "may be directed to showing either that the patentee's delay was reasonable or that the defendant suffered no prejudice or both." *Auckerman*, 960 F.2d at 1038.

97. Because the presumption applies in this case, the burden of proof, although not the burden of persuasion, now shifts to LendingTree to introduce evidence that its delay was reasonable under the circumstances, or whether an unreasonable delay was caused by the alleged excuses. *Id*. at 1037.

98. During discovery—which is precisely the time it was incumbent upon LendingTree to come forward with laches excuses—LendingTree admitted that it had no excuses or justifications for its unreasonable delay in filing suit against NexTag. DX1346 at 37-38 (LendingTree's Response to Request for Admission No. 29).

99. Despite its failure to come forward during discovery, LendingTree attempts to put forward the very excuses it withheld during discovery. Dkt. No. 454.

100. When LendingTree attempted to introduce these excuses at the last minute during summary judgment briefing, the Court appropriately struck them under Fed. R. Civ. Pr. 36(a) and 37(c)(1). Dkt. Nos. 454, 457.

101. More specifically, during discovery, LendingTree admitted that it "is unaware of any legal or physical prohibition that prevented it from filing a claim for patent infringement against NexTag between August 31, 2004, to September 8, 2010." Response to Request for Admission No. 29.

102. Any matter admitted is "conclusively established." Fed. R. Civ. P. 36(a).

103. "In form and substance a Rule 36 admission is comparable to an admission in pleadings or a stipulation drafted by counsel for use at trial, rather than to an evidentiary admission of a party." *Advisory Committee's Note*, 48 F.R.D. 487, 534 (1970).

104. Once admitted under Rule 36, a matter is "<u>conclusively established</u> unless the court, on motion, permits the admission to be withdrawn or amended." *Sommerville v. Dobson*, No. 4:10cv67, 2011 U.S. Dist. LEXIS 156380, at *13 (E.D. Va. Mar. 8, 2011) (emphasis in original) (citing *Adventis, Inc. v. Consolidated Property Holdings, Inc.*, 124 Fed. App'x 169, 173 (4th Cir. 2005) (unpublished opinion) (noting the conclusive effect of an admission under Federal Rule of Civil Procedure 36(b)); *Armour v. Knowles*, 512 F.3d 147, 154 n.13 (5th Cir. 2007) (observing that "an admission that is not withdrawn or amended cannot be rebutted by contrary testimony.")).

105. Because LendingTree admitted during discovery that it had no laches excuses, that admission cannot be disregarded and must be treated as conclusively established. *Adventis*, 124 Fed. App'x at 173. ('[O]nce a matter that is properly subject of an admission under Rule 36 has been admitted during discovery, the district court is not free to disregard that admission."); *Sommerville*, 2011 U.S. Dist. LEXIS 156380, at *13 (citing *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3rd Cir. 1992) ("Rule 36 admissions are conclusive for purposes of the litigation.").

106. LendingTree did not file a motion requesting that the admission be withdrawn or amended.

107. Without such a motion, LendingTree is held to its admission and cannot rebut the presumption of unreasonable delay. *See Adventis*, 124 Fed. App'x at 173.

108. Further, LendingTree's failure to disclose its proposed excuses and justifications in

discovery prevents their use at trial. *See* Dkt. Nos. 454, 457.

109. Despite repeated sanctions from this Court for its failure to fulfill its discovery obligations, LendingTree never provided any substantive excuses or justifications to NexTag. *See* Dkt. Nos. 268, 346, 383.

110. A party that without substantial justification fails . . . to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial … information not so disclosed. Fed. R. Civ. P. 37(c)(1).

111. Rule 37(c)(1) "requires witness and information exclusion for an untimely disclosure, unless the violation is substantially justified or harmless." *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 n.10 (4th Cir. 2002) (citing 8A Wright, Miller & Marcus, *Federal Practice and Procedure* §2289.1 (2d ed. 1994).

112. NexTag served three different interrogatories to ascertain LendingTree's Laches Excuses or justifications for its unreasonable delay. *See* DX1345 at 51, 112, 116 (Interrogatory Nos. 9, 26 and 27).

113. In response, LendingTree failed to timely respond with substantive excuses or justifications.

114. Without the excuses and justifications, LendingTree cannot rebut the presumption of unreasonable delay in filing suit against NexTag

115. Notwithstanding the untimeliness of LendingTree's asserted substantive excuses and justifications, the Court briefly addresses them and concludes they are without merit. LendingTree contends that its decision to refrain from filing earlier against NexTag was reasonable in light of: (1) its lack of access to NexTag confidential information, (2) its

inability to determine infringement when it performed an analysis, (3) other litigation, (4) various corporate acquisitions, (5) patent license negotiations, and (6) business negotiations.

116. LendingTree's assertion that it could not determine infringement because it lacked information about the functioning of the NexTag website is belied by the fact that LendingTree did, in fact, suspect infringement based solely on publicly available information. PTX-0995 (stating that there exists "sufficient evidence" that NexTag infringes). LendingTree employees most knowledgeable about LendingTree's patents and NexTag's accused service conducted an infringement analysis on October 6, 2004, utilizing only public information that was available at the time of the October 27, 2003, email circulated among LendingTree's legal department. *Id.*; DX1350; *see also* Trial Tr. 1155:15-17, 1278:13-1280:4 (Ashley Cross). LendingTree utilized this same public information in 2010 to file suit against NexTag. Trial Tr. 1279:20-23. In fact, LendingTree's "Disclosure of Asserted Claims and Infringement Contentions," which was served over five months after LendingTree filed suit, specifically disclaimed access to confidential information. DX1347 ("LendingTree makes this disclosure based entirely on its review and analysis of public information and without the benefit of discovery from any of the Defendants in this action."). If public information was sufficient in 2010 for LendingTree to file suit, there is no reason why it would have been insufficient when LendingTree had access to it in 2003.

117. Second, LendingTree's inability to conclusively determine infringement does not justify its unreasonable delay. It is well-settled that the knowledge relevant to the laches inquiry is

the plaintiff's knowledge of the facts and features of the accused product that form his infringement allegation. "Knowledge as to whether the device itself actually infringe one's patent is not required to establish laches." *Thomas v. Echostar Satellite LLC*, 2006 U.S. Dist. LEXIS 91748, at *15 (W.D.N.C. Dec. 19, 2006) (citing *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1391 (Fed. Cir. 1995)). In fact, LendingTree utilized the same public information available in 2003 in its internal infringement analysis in 2004 and to file suit in 2010. *See also Alexander v. Phillips Petroleum Co.*, 130 F.2d 593, 606 (10th Cir. 1942) ("[W]here the facts were known to the plaintiff, ignorance of the law ... will not ordinarily excuse delay in asserting the claim."); *Wanlass v. General Elec. Co.*, 148 F.3d 1334 (Fed. Cir. 1998) ("[T]he means of knowledge are generally equivalent to actual knowledge") (citing *Potash Co. of America v. International Minerals & Chemical Corp.*, 213 F.2d 153, 155 (10th Cir. 1954); *Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 917, 922 (E.D. Va. 1996), remanded on other grounds, 116 F.3d 1497 (Fed. Cir. 1997) (delay in filing suit is not justified where "the patentee already knew about the product, knew that it involved technology similar to the patented invention, and knew that it accomplished a similar result.").

118. Similarly, LendingTree's reliance on its own internal opinion in 2004 (that there was "sufficient evidence" of NexTag's alleged infringement and that outside counsel should be contacted) is likewise not a legally cognizable reason for its delay in filing suit. See, e.g., *Coleman v. Corning Glass Works*, 619 F. Supp 950, 954 (W.D.N.Y. 1985) (rejecting the idea that the laches period begins running only after a patent holder receives a favorable legal opinion, as the fact that is "critical for the measurement of laches, [is] that [the

plaintiff] waited more than six [] years to apprise the defendant of those plans.").

119. LendingTree asserted its patents against LowerMyBills in April 2005 and against Cyber Financial Network a few months later in September 2005. Both cases settled. (PTX 68; Feb. 21, 2014 a.m. Tr. at 1126:16-18; March 12, 2014 a.m. Tr. 4215:8-11; *LendingTree LLC v. Cyber Financial Network, Inc.*, No. 3:05cv388 (W.D.N.C.)). Both cases were filed in the Western District of North Carolina, the same district where LendingTree filed the instant case against NexTag in 2010.

120. Outside of laches and equitable estoppel, LowerMyBills asserted the same defenses that NexTag asserted in the present case. For example, LowerMyBills asserted a defense of patent invalidity due to improper inventorship, patent unenforceability due to inequitable conduct, and the statutory bar. LowerMyBills also asserted a defense of non-infringement. (March 12, 2014 a.m. Tr. at 4224:24-4225:1.)

121. Other litigation is only relevant where the infringer is advised of "the patentee's intention to enforce its patent upon completion of that proceeding." *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 877 (Fed. Cir. 1991) (citing *Watkins v. Northwestern Ohio Tractor Pullers Ass'n*, 630 F.2d 1155, 1162-63 (6th Cir. 1980). "For other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer. . . . Notice is important [because it] informs the accused infringer of the existence of the suit and that a subsequent suit will be filed against him. He can then change his activities to avoid liability." *Id*. (emphasis added)

122. While "there has been no clearly established rule set forth by the Federal Circuit (or any other court) which absolutely requires a patentee to make an infringement allegation prior

to bringing suit . . . the proper test requires an objective inquiry into whether the patentee acted reasonably in light of all of the circumstances." *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, No. 09 Civ. 290, 2014 WL 183212, at *26 (W.D. Pa. Jan. 14, 2014) (citing *Hemstreet*, 972 F.2d at 1293 ("Aukerman restores equitable flexibility: The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant.")). "Despite all of the evidence of potential infringement it possessed, [LendingTree] never made such a direct inquiry of infringement to [NexTag] prior to filing suit. While such facts are not dispositive, they must still be considered by the Court among the totality of the circumstances to determine if [LendingTree] acted as a reasonable patentee." *Id.*

123. LendingTree argues that NexTag knew, or must have known, about LendingTree's potential claims throughout the time period of the LowerMyBills litigation. This argument is unavailing. NexTag's former CEO, Scott Simmons, testified that NexTag did not know and had no reason to know that LendingTree was considering a suit against NexTag. LendingTree points to letters to NexTag option holders from a period of less than two years that stated, "[t]here can be no assurance that LendingTree will not assert these patents against NexTag." However, Mr. Simmons testified that these disclaimers did not mean that NexTag expected LendingTree would file suit against NexTag. Rather, the documents actually show that NexTag did not anticipate being sued because, as Mr. Simmons testified, NexTag would have been required to clearly state that if there was such an expectation. Instead, NexTag referenced the LendingTree patents in a section of the option holder letter that included warnings as far-fetched as "terrorist attacks" and "armed hostilities." Rather

than showing NexTag knew of LendingTree's potential infringement claims, the letters and testimony of Mr. Simmons evidence the exact opposite.

124. LendingTree's October 7, 2005, letter to NexTag (the "Licensing Letter") is also insufficient to provide notice. DX1024; *see also Amsted Indus. v. Buckeye Steel Castings, Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994) ("Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device.") (emphasis added); see also *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001). The Licensing Letter invites a licensing discussion. It does not accuse NexTag of infringement. Trial Tr. 1283:1-6 (D. Ashley Cross); 1312:11-15 (D. Ashley Redirect); 2043:14-24 (D. Lebda Cross).

125. The other periods of litigation are similarly unavailing. LendingTree was sued for patent infringement by 1) IMX, 2) Source Search Technologies and 3) Block Financial, none of which involved the '816 Patent. In each of these, LendingTree was the defendant. Trial Tr. 1285:19-1286:2 (D. Ashley Cross). These cases – which did not involve the '816 Patent – could not even ostensibly provide notice to NexTag that LendingTree might assert a patent claim against NexTag. Other companies filing suit against LendingTree for patent infringement are wholly unrelated to any potential claims of infringement of the '816 Patent and, as such, are irrelevant to this analysis.

126. LendingTree's former Assistant General Counsel, Debra A. Ashley, testified that LendingTree never performed any analysis to determine the costs or potential burden on of filing suit against NexTag. Trial Tr. 1286:13-1287:9 (D. Ashley Cross) There has been no showing that LendingTree could not have added NexTag to the LowerMyBills litigation or

lacked the manpower in the legal department (or otherwise) to pursue litigation. Notably, in the case at bar, LendingTree sued several unrelated entities for patent infringement. LendingTree has not demonstrated why it could have also pursued its claims against NexTag in the LowerMyBills case

127. Tolling the laches period during any litigation of a corporate entity would swallow the rule – corporations are constantly in litigation of one form or another. LendingTree's own evidence shows that it was involved in litigation continuously from 2000 to the date it finally sued NexTag. Excusing LendingTree's delay as a consequence of its pending litigation would eviscerate the doctrine of laches entirely.

128. LendingTree also claims that various corporate acquisitions and restructuring excuses its delay in filing suit. Similar to the argument that any litigation serves as a justification for delay, this excuse would swallow the rule – corporations, including publicly traded corporations like LendingTree, are constantly restructuring, investigating potential acquisitions, and/or are themselves acquisition targets. Further, this alleged justification also appears to assume that Mr. Lebda, not LendingTree, is the entity that matters for a laches analysis. Mr. Lebda "becom[ing] IAC president and mov[ing] to New York" are completely irrelevant to whether LendingTree is justified in its delay in filing suit against NexTag. As such, there has been no showing that any of the corporate acquisitions, restructuring, or Mr. Lebda's location in any way justifies LendingTree's delay.

129. At least one district court has have held that a delay was reasonable when "the length of delay corresponds to the negotiations between the parties to develop a business relationship and resolve their patent and licensing issues" and the plaintiff files suit "a short time" after

negotiations end without a final agreement. *See DSM Desotech, Inc. v. 3D Sys. Corp.*, 900 F. Supp. 2d 783, 793 (N.D. Ill. 2012). To support its contention that its delay was justifiable due to patent license negotiations, LendingTree points to two documents: (1) an October 7, 2005, letter from Doug Lebda to Purnendu Ojha at NexTag and (2) an email chain between Greg Wharton, NexTag's General Counsel, and Debra Ashley, LendingTree's Assistant General Counsel that spanned the dates October 26, 2005, to December 13, 2005.

130. First, Ms. Ashley testified that the October 7, 2005, letter was an invitation to NexTag "to enter into discussions with LendingTree regarding licensing LendingTree's patents." DX1024. Clearly, no licensing negotiations occurred as of that date. Trial Tr. 2045:1-15 (D. Lebda Cross). In fact, on November 23, 2005, Debra Ashley sent a follow-up letter noting that NexTag had "not responded to my initial request for information." DX472. Ms. Ashley testified that the email chain, which spanned a time period of 1 month and 17 days, was "a discussion regarding NexTag's potential license of the LendingTree patents." Trial Tr. 1124:23-1125:1 (D. Ashley Direct). LendingTree and NexTag never signed a non-disclosure agreement. Nor did they exchange any confidential information. No terms were offered. DX1362; see also Trial Tr. 1284:3-21 (D. Ashley Cross). Ms. Ashley testified that the November 23, 2005 letter was sent in the "hop[e] to have amicable business discussions and reach a licensing arrangement, or receive information to determine that no license was required." Trial Tr. 1307:11-15 (D. Ashley Redirect)

131. The email chain and letters relied upon by LendingTree provide no justification for a tolling of the laches period. On their face and according to the testimony of LendingTree's

34

witness, these do not appear to be "patent license negotiations" but rather invitations to negotiate. Regardless, the tolling period that this alleged justification would produce would only be 1 month and 17 days. Since the laches period in question was over 7 years, this alleged justification has no effect on the presumption of laches. Further, because these dates overlap with any tolling of the laches period during the LowerMyBills and Cyber Financial litigations, they would have no effect on the laches period should all three be recognized as excuses.

132. Several early laches opinions hold that business negotiations between the plaintiff and the alleged infringer can justify a delay. *See Aukerman Co. v. Miller Formless Co., Inc.*, 693 F.2d 697, 700 (7th Cir. 1982); s*ee also Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1377–78 (7th Cir. 1972). In a recent case from the Northern District of Illinois, the court held that a delay was reasonable when "the length of delay corresponds to the negotiations between the parties to develop a business relationship and resolve their patent and licensing issues" and the plaintiff files suit "a short time" after negotiations end without a final agreement. *DSM Desotech*, 900 F. Supp. 2d at 793. A key distinguishing fact in these cases is that the parties carried out negotiations over the patents or licenses at issue in the suit. In this case, the parties carried out negotiations to create a business partnership. The '816 Patent was not at issue in the negotiations, nor was it ever raised as a potential issue before or after the negotiations allegedly occurred. Trial Tr. 1548:10-13 (Simmons Direct)

133. Furthermore, the parties dispute whether these negotiations ever occurred. There is contradictory testimony. The only documentary evidence put forward by LendingTree is an

email in which a third party stated that he would "check[] to see if Purnendu [sic] Ojha (NexTag founder and former CEO) can attend." PTX1512.

134. There is no evidence that a meeting ever occurred, that Mr. Ojha was in attendance if it did occur, that any Non-Disclosure Agreement was entered into or that any negotiations actually occurred other than the unsupported testimony of Mr. Lebda that "some discussions" occurred regarding "potentially merging." Trial Tr. 4275:8-22 (D. Lebda Direct).

135. Mr. Lebda's testimony on this point is internally inconsistent. At trial, he testified that he met with Scott Simmons regarding an acquisition in 2009. Trial Tr. 4275:8-13 (D. Lebda Direct).

136. However, his sworn declaration attached to the Opposition to NexTag's Motion for Summary Judgment stated that Scott Simmons was not present at the meetings. D.I. 443-1 ¶ 28.

137. Mr. Simmons testified at trial that no such meeting occurred. Trial Tr. 1547:15-1548:9 (Simmons Direct).

138. Even if the Court recognizes LendingTree's belated Laches Excuses, these excuses did not suspend indefinitely LendingTree's duty to bring suit in a timely manner. *Thomas*, 2006 U.S. Dist. LEXIS 91748, at *17.

139. These excuses clearly do not justify the delay, particularly since, as LendingTree admits, "it is unaware of any legal or physical prohibition that prevented it from filing a claim for patent infringement against NexTag between August 31, 2004 to September 8, 2004." LendingTree's Response to Request for Admission No. 29.

140. Throughout 2002-2010, LendingTree was working with NexTag to advertise its services while LendingTree's subsidiary, Home Loan Center, purchased leads from the same NexTag system LendingTree eventually accused of infringement. DX1235, DX987, DX1025, DX991, DX1263, DX1505; Trial Tr. 1771:19-21 (Lebda Direct); 1549:16 (Simmons Direct).

141. These interactions are not evidence of an excuse or justification for delaying suit, rather, they reinforce that LendingTree was on notice of NexTag's activities in the mortgage lead generation space. *Everspin Techs., Inc. v. NVE Corp.*, Civ. No. 12-474, 2014 WL 988458, at *16 (D. Minn. March 13, 2014).

142. LendingTree suspected NexTag of copying its business model – "fill out one form and be matched with up to four lenders" – at least as early as October 27, 2003. DX1350.

143. Non-enforcement of the '816 Patent indicates that LendingTree did not think it had a patent claim in the seven years that followed or that it made a tactical decision not to pursue its claims, not that it was unaware of NexTag's service. *Everspin*, 2014 WL 988458, at *16.

144. The unreasonable and inexcusable nature of LendingTree's delay is all the more evident after acknowledging how long the period of delay is even after 1) calculating the laches period from the issuance of the '816 Patent [August 26, 2003]; 2) excusing the alleged delay during the *LowerMyBills* and *Cyber Financial* litigations [2 years, 9 months and 24 days]; 3) excusing the alleged delay during the "patent license negotiations" [1 month and 17 days that overlap completely with the *LowerMyBills* and *Cyber Financial* litigations and therefore do not count as tolling if they are included] and 4) giving LendingTree credit for the total: 2 year, 9 month and 24 day tolling period. The shortest delay is still 4 years, 2

months and 20 days.  It is within the discretion of the Court to find that a delay of less than six years is unreasonable. *See Asics,* 974 F.2d at 1307.

145. LendingTree made no effort at all to inform NexTag of potential infringement issues with regard to the '816 Patent, and the delay in this case is well over six years.  For the reasons stated above, the Court concludes that NexTag has shown with actual proof that the delay between the date of LendingTree's first knowledge and September 8, 2010, excluding the tolling period, was unreasonable and inexcusable.

146. To show evidentiary prejudice, NexTag must demonstrate the loss of evidence due to the delay that hinders its ability to present a full and fair defense on the merits.  *Aukerman*, 960 F.2d at 1033.  This loss of evidence can take the form of the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts. *Id*.

147. NexTag has clearly shown the loss of evidence due to (1) the death of a witness, (2) the unreliability of memories, (3) shutdown of the NexTag system, (4) witness unavailability, (5) the loss of documents and (6) the late production of documents, which made them unavailable during discovery and to cross witnesses who could not be brought to trial.

148. Richard Stiegler, named as one of the co-inventors of the '816 Patent, passed away March 28, 2004. Trial Tr. 512:15-25 (Lebda Direct). Mr. Lebda testified that Mr. Stiegler worked extensively with William Collard, the prosecuting attorney on the '816 Patent.  Trial Tr. 707:12-708:12 (Lebda Direct). Mr. Lebda also testified that he could not remember what materials were provided to Mr. Collard during the prosecution of the '816 Patent. Trial Tr. 708:13-24 (Lebda Direct); 1750:18-1751:3, 1936:10-25, 1988:13-15, 1990:20-1996:25

(Lebda Cross).

149. Had LendingTree filed suit when it learned about NexTag in 2003, not only would Mr. Stiegler have been available to testify regarding NexTag's on-sale bar and inequitable conduct defenses, but the memories of Mr. Lebda and Mr. Collard likely would not have faded to such an extent that NexTag's defenses were hindered.

150. Memories unquestionably faded in the seven years that passed between LendingTree's first knowledge of NexTag's allegedly infringing activities and filing suit. *See, e.g.,* Trial Tr. 708:13-24 (Lebda Direct); 1750:18-1751:3, 1936:10-25, 1988:13-15, 1990:20-1996:25 (Lebda Cross).

151. Multiple witnesses admitted that their inability to remember relevant facts and details was due to the passage of time.

152. Multiple witnesses during their depositions testified that they could not remember facts due to the passage of time. DX207 at 43:15-44:4, 52:5-9, 53:1-10, 72:11-17, 84:12-17, 86:25-87:12, 132:12-133:10, 148:18-149:18, 159:2-160:14, 161:3-4, 162:13-163:3, 164:4-6, 165:18-22, 174:16-18, 175:10-19, 178:13-23, 179:25-180:13, 190:21-193:18; DX310 at 9:7-10:6, 20:9-21:2, 30:12-32:5, 33:13-15, 51:25-53:14, 56:21-57:1, 58:2-60:7, 64:12-66:2, 68:6-19, 76:14-78:2, 80:16-81:11, 84:22-85:5, 97:2-99:2, 100:4-25, 101:9-11, 101:20-103:22, 107:6-14; DX406 at 36:13-37:22, 70:9-15, 79:7-20, 126:1-10, 129:4-130:3; DX1268 at 12:6-10, 17:9-13, 50:8-21, 61:12-16, 64:6-14, 69:23-70:8, 74:14-75:12, 77:16-22, 86:14-87:8, 113:12-114:5, 116:16-18, 118:11-14, 130:16-23, 131:6-9, 132:3-8, 134:23-135:11, 139:22-140:4, 158:18-159:4, 159:11-17, 160:14-25, 163:8-19; DX1341 at 42:21-44:14, 78:24-79:9, 98:4-22, 99:5-100:4, 102:18-22; Trial Tr. 665:12-666:20, 667:1-668:18.

153. At trial, Tara Lebda testified on seven different instances relating to documents and facts highly relevant to NexTag's invalidity defense that she could not remember facts and details due to the passage of time. Trial Tr. 665:12-668:10 (T. Lebda Cross).

154. LendingTree's former CEO Robert Wilson had no memory about the market and LendingTree's operations—information material to damages and patent validity under §102(b). In his deposition, Wilson explained "I couldn't begin to make distinctions amongst [the competition]. It's just too long ago." DX1268 at 87:6-8. When asked if reading his letter with Lebda refreshed his recollection of LendingTree's prior art system developed by a contractor, Maverick, Wilson responded:

> I am flabbergasted… [because] my memory sitting here today, of what Maverick had done to even reference some of the things in this letter…are not clear to me. Where Maverick left off and what Rick Stiegler [now deceased inventor] improved upon, none of that is clear to me.

*Id.* at 158:18-159:4.

155. The fading memories of Doug Lebda, Tara Lebda, Robert Wilson and others prejudiced NexTag's defense.

156. LendingTree attempts to negate this memory loss by claiming that these specific instances of faded memories are only "immaterial forgetfulness on topics outside each witness's expertise." Dkt. No. 443 at 16. However, the faded memories of Doug Lebda, Tara Lebda and Bob Wilson as to documents and events highly probative of NexTag's on-sale bar and public use defenses are neither "immaterial" nor "outside [their] expertise." These are three of only five (or fewer) people who could testify as to the contents of these documents, which have been lost due to the passage of time, and the specifics of certain events in which

they, and only they, were percipient witnesses. LendingTree's dismissal of these faded memories cannot bring back the memories that were lost due to LendingTree's substantial and prejudicial delay in filing suit.

157. NexTag's shuttered the accused service before LendingTree filed the suit. Trial Tr. 1485:19-1486:10 (Simmons Direct).

158. LendingTree's delay left NexTag without a live website to demonstrate to the jury. Trial Tr. 1485:19-1487:19. Instead, NexTag was forced to rely on static, black and white screenshots of the accused system during trial. *See, e.g.,* DX1446, DX1347; Trial Tr. 1487:20-1503:7, 1583:10-16.

159. In many instances, those screenshots were actually obtained from LendingTree's late-produced documents from LendingTree's backup tapes because they were unavailable to NexTag. *See, e.g.,* DX1446, DX1347; Trial Tr. 1487:20-1503:7, 1583:10-16.

160. Furthermore, NexTag's technical expert was only able to access source code regarding the back-end database system. Trial Tr. 3142:5-25. The source code that was available did not relate to the front-end, consumer-facing web pages. *Id.*

161. Nearly every NexTag key employee involved with the accused service left NexTag's employment by the time suit was filed – that stands to reason inasmuch as NexTag shuttered the accused system before LendingTree filed suit. Trial Tr. 1486:3-10; 1583:2-22 (Simmons Direct)

162. Although LendingTree notes that *three* high-level employees of NexTag were deposed in the case and that Scott Simmons testified on NexTag's behalf at trial, none of these witnesses were involved in the initial design of the mortgage lead generation service and

*none* of the witnesses wrote any of the code at issue.

163. Prior to LendingTree filing suit in September 2010, NexTag had hundreds of employees who worked on the mortgage lead generation service, including employees involved in the development of the service, upkeep of the service and marketing of the service. Trial Tr. 1447:11-13, 1465:10-1466:4, 1583:17-1584:1. NexTag is based in California. None of these former employees were subject to the subpoena power of the Court and none testified at a deposition or at trial.

164. Additionally, hundreds of lead buyers went out of business by 2010. Trial Tr. 1585:1-10. This made it more difficult to locate individuals with knowledge relevant to NexTag's non-infringement defense. Additionally, the leads, i.e., the actual information sent to lead buyers, were lost when these lead buyers went out of business. Despite this case pending for nearly 3 and 1/2 years prior to trial, neither NexTag nor LendingTree were able to produce a *single lead* delivered by NexTag to its customers, the act that LendingTree accused of infringement.

165. Furthermore, dozens of competitors/mortgage lead providers went out of business prior to 2010. LendingTree's damages expert, Cate Elsten, based her analysis on the absence of non-infringing alternatives or competitors in the marketplace prior to 2007, the date to which LendingTree's damages were limited at trial. DX567; Trial Tr. 1238:18-1239:11 (Elsten Cross). Without the continued existence of these competitors/mortgage lead providers, NexTag's ability to rebut LendingTree's damages case was substantially hindered.

166. Finally, LendingTree's former CEO Robert Wilson was unavailable at trial due to his ailing

health. Trial Tr. 703:1-7.

167. Mr. Wilson was deposed in the *LowerMyBills* litigation and in this case.

168. However, as outlined in the sections below, the relevant documents from LendingTree's backup tapes were not yet available at the time of his deposition in this litigation. Because he could not attend trial, NexTag never had the opportunity to cross-examine him or refresh his recollection with the documents recovered from LendingTree's backup tapes.

169. Additionally, the backup tape restoration only related to tapes that contained the single term "NexTag" in the period 2003-2005. Dkt. No. 336. As such, the relevant documents related to invalidity and Bob Wilson's knowledge regarding the on-sale bar and public use defenses were never recovered – those documents would not have been captured from the backup tape restoration which was limited in time (2003-2005) and limited to a single word ("NexTag").

170. All of these witnesses and documents would have been available had LendingTree timely filed suit against NexTag when it first became aware of NexTag's allegedly infringing activity, i.e., back in 2003.

171. LendingTree attempts to counter these arguments of lost witnesses and documents by pointing to the depositions taken during the *LowerMyBills* litigation. However, NexTag was *not* a party to that litigation, and it *did not* have an opportunity to participate in the deposition of these witnesses or subpoena documents from them at that time.

172. Importantly, LendingTree ostensibly could have added NexTag as a party to the *LowerMyBills* litigation - it admitted that the LowerMyBills system was similar to the NexTag mortgage lead generation service. Trial Tr. 1639:13-22 (Simmons Cross), 1001:14-

1002:25 (Elsten Direct); PTX138. Thus, any loss of documents that were available during the *LowerMyBills* litigation is directly the result of LendingTree's choice not to add NexTag to that litigation and/or file suit earlier.

173. Mr. Lebda admitted that LendingTree did not implement a litigation hold regarding NexTag until suit was filed in 2010. Trial Tr. 2061:10-2065:2. As a result, no one was instructed to save any paper documents, handwritten notes, websites, or other documents relevant to the issues of infringement or the on-sale bar.

174. Although it is impossible to know the full scope of what was lost, the fact that LendingTree did not even produce a copy of its October 2005 Licensing Letter to NexTag (DX1024) – NexTag produced it to LendingTree – which featured so prominently at trial. This illustrates the type of critical documents that were not preserved.

175. In response, LendingTree argues that NexTag was not prejudiced because: 1) LendingTree gathered documents in the LowerMyBills case, and 2) it preserved documents on backup tapes. These facts do not come close to eliminating the prejudice to NexTag. With respect to the LowerMyBills litigation, there has been no showing that: 1) the defenses of incorrect inventorship and on-sale bar were alleged; 2) the discovery requests were substantially the same, 3) all documents relevant to non-infringement were collected, or 4) that LowerMyBills, who settled, was satisfied with the scope of LendingTree's production. For example, no documents regarding the St. Lee compliance program, which evaluated how competing websites like LowerMyBills functioned, were ever produced in the LowerMyBills lawsuit. *See* DX1312; Trial Tr. 1843:12-1851:25.

176. LendingTree's delay in filing suit, coupled with its policy to preserve documents only on

backup tapes, caused substantial prejudice to NexTag.

177. First, NexTag was required to pay over $160,000 (20% of the total cost) to search LendingTree's backup tapes for documents containing the word "NexTag". Sept. 6, 2013 Hrg, Tr. at 92:5-94:3; Trial Tr. 2227:21-22 (Lebda Direct), 2274:3-14 (Lebda Cross). Second, NexTag was not given an opportunity to search for other documents that might be highly relevant, but did not contain the word "NexTag". Dkt. No. 336. For example, LendingTree's "St. Lee Compliance" assessments of other competitors were not produced because they did not contain the word "NexTag". Other documents relating to Jamie Bennett, Richard Stiegler, or CreditSource USA were not produced because they would not have contained the word "NexTag". If suit had been timely filed, LendingTree would be required to search its records, including those now on its inaccessible backup tapes, for documents responsive to *all* of NexTag's document requests.

178. Because of the limited nature of the search (required due to the fast-approaching trial and cost constraints), relevant documents not containing the word NexTag are shielded from discovery inaccessible backup tapes.

179. For those 30,000 documents containing the word "NexTag" that were produced from the backup tapes, NexTag suffered prejudice due to timing of the production. These documents were produced, on a rolling basis, in November 2013, months after the close of discovery, and just two months before trial. NexTag had no opportunity to depose the authors of the e-mails and documents in question. NexTag had a very limited time to review documents and use them in connection with its motion for summary judgment. If suit had been filed in 2003 (or even 2005) the e-mails and other documents would have been "live," i.e., not

buried inside inaccessible backup tapes, they would have been searched in response to NexTag's discovery requests, and they would have been timely produced for use at depositions.

180. To show economic prejudice, NexTag must demonstrate a material change in its economic position during the period of delay that occurs "because of and as a result of the delay." *Hemstreet*, 972 F.2d at 1294.

181. What NexTag would or would not have done and at what time is not as important as the actions NexTag *did* take and the reasons it took those steps.

182. NexTag would not have entered into any additional business relationships with LendingTree if LendingTree had sued on '816 Patent earlier or if LendingTree had given appropriate notice of infringement instead of sending the October 2005 Licensing Letter. Trial Tr. 1580:3-21 (Simmons Direct).

183. The 2003, 2004, 2005 and 2009 agreements between the parties changed NexTag's economic position. First, LendingTree and its subsidiaries negotiated the agreements with NexTag without informing NexTag that it would face potential liability for the very sales it was making to LendingTree and its wholly owned subsidiaries, including Home Loan Center. *Id.* The risk of such liability would have likely changed the pricing structure agreed upon by the parties. *Id.* Second, because LendingTree delayed filing suit on the '816 Patent, NexTag never had the opportunity to develop a noninfringing system, as Scott Simmons testified could have been done had NexTag known that it would face liability for its system. Trial Tr. 1581:17-23, 1590:19-1591:22 (Simmons Direct).

184. Further, Mr. Lebda testified at trial that there were various ways for a mortgage lead

generation system like NexTag's to not infringe, such as not filtering or not fulfilling the "lenders compete" step. Trial Tr. 4252:11-1.

185. Finally, NexTag entered into some of the business relationships with LendingTree and its subsidiaries in order to bolster its own flagging business, which had begun to decline as early as 2007. All of this reveals that had NexTag faced an infringement suit earlier, it could have exited the mortgage lead generation market earlier or redirected its investments to other products.

186. In *ABB Robotics, Inc. v. GMFanuc Robotics Corp*., the Federal Circuit found economic prejudice where the delayed suit resulted in the alleged infringer continuing to invest in its business with expenditures on procuring patents and developing related technology, a threefold expansion of the alleged infringing activity, and failure to take a license under the relevant patent. *See* 52 F.3d 1062, 1065 (Fed. Cir.1995). "Even a considerable investment during a delay period is not a result of the delay if it was 'a deliberate business decision to ignore [a] warning, and to proceed as if nothing had occurred.'" *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 775 (Fed. Cir. 1995) (quoting *Hemstreet,* 972 F.2d at 1294).

187. But here, NexTag did not ignore any warnings.

188. LendingTree first sat on its claims for approximately seven years, choosing instead to sue other parties. Then, LendingTree engaged in business negotiations and signed multiple agreements with NexTag, never disclosing its potential infringement claims. Trial Tr. 1579:10-1582:16 (Simmons Direct). Finally, LendingTree continued to hold off on bringing its suit as NexTag's profitability deteriorated and NexTag's mortgage lead generation

business plummeted. Trial Tr. 1566:12-23 (Simmons Direct), 1616:11-19 (Simmons Cross).

189. LendingTree only filed suit after NexTag exited the market. Trial Tr. 1485:19-1484:10 (Simmons Direct). If LendingTree had brought its suit before the presumption of prejudice at six years, NexTag would have had the opportunity to either design around the LendingTree patents or wait before investing its time and resources into products that might infringe. *See, e.g., Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1375-76 (Fed. Cir. 2010).

190. At numerous points over the last eleven years, "[LendingTree's] delay in bringing an infringement action deprived [NexTag] of the opportunity to modify its business strategies." *SCA Hygiene*, 2013 WL 3776173, at *7.

191. Because LendingTree waited to sue until after NexTag exited the industry altogether, NexTag could neither modify its system or offset its losses with profits on existing sales. *Medinol*, 2014 WL 1041362, at *42; *see, e.g.,* Trial Tr. 1581:17-23, 1582:17-1583:16, 1590:19-1591:22 (Simmons Direct).

192. NexTag has shown sufficient proof of economic prejudice to warrant the application of laches.

193. LendingTree clearly knew or should have known that it had a claim against NexTag by 2003. This delay creates a presumption that the delay was unreasonable, inexcusable, and prejudicial. However, even assuming that NexTag did not meet its presumption burden, the Court still finds that the balance of equities warrants judgment on laches in favor of NexTag.

194. LendingTree conducted an ongoing business relationship with NexTag during the entire period of time between 2003 and 2010. Trial Tr. 1579:10-1582:16. However, LendingTree never claimed that NexTag was infringing its patents. *Id.* at 1541:3-5, 1579:10-1580:2 (Simmons Direct), 1312:11-15 (Ashley Direct).

195. In addition, during discovery, LendingTree steadfastly refused to supplement its discovery responses to identify any Laches Excuses. Instead, LendingTree maintained the untenable position that NexTag "should drop this frivolous [laches] defense." *See* DX1345 at 51-56 (LendingTree's Responses to Interrogatory Nos. 9, 26, 27).

196. Recognizing—too little, too late—for the first time that NexTag's laches defense actually had teeth, LendingTree introduced Laches Excuses two months before trial in its opposition to NexTag's Motion for Summary Judgment. The Court struck LendingTree's Laches Excuses identified for the first time in the Declaration of Doug Lebda in support of LendingTree's Opposition to NexTag's Motion for Summary Judgment on Laches. Dkt. No. 457.

197. LendingTree's backup tapes yielded numerous documents detailing LendingTree's awareness of NexTag's allegedly infringing system. *See, e.g.,* DX1269-DX1333, DX1350-DX1359. However, LendingTree refused to search its backup tapes until two federal judges ordered it to do so. Dkt. No. 336, 342, 346, 351; Sept. 6, 2013 Hrg. Tr. at 88:22-94:11. While vigorously opposing NexTag's Motion to Compel, LendingTree failed to disclose to the Court that it only first implemented a litigation hold for NexTag in 2010. Instead, LendingTree vigorously opposed any search, improperly claiming that any such documents would be "cumulative of what has already been produced." (Dkt. 325 –

Opposition to Motion to Compel).

198. Although Doug Lebda testified at trial that no litigation hold was necessary because documents were preserved on backup tapes, LendingTree took the opposite position during discovery. *Compare* Trial Tr. 2064:2-10 *with* Sept. 6, 2013 Hrg. Tr. at 5:14-21, 13:7-14. LendingTree repeatedly asserted it had no obligation to search backup tapes. Indeed, LendingTree's counsel had no idea how many backup tapes even existed (cf. Dkt. No. 337 Motion to Stay (stating there were "in excess of 100 tapes) with Dkt. No. 350 Motion for Expedited Reconsideration (stating there were 1008 tapes)).

199. Even after the Court ordered production of documents from backup tapes, it took several months for LendingTree to produce responsive documents, which came well after the close of fact discovery. Even then, "[i]t took two federal judges to kick LendingTree into doing it." Trial Tr. 2273:6-7 (Hon. F. Whitney). LendingTree's counsel was fined $5,000 a day for failing to comply with the Court's order requiring production of documents from the backup tapes. D.I. 346 at 3.

200. Although LendingTree knew that it was relying on backup tapes instead of the required litigation hold, LendingTree argued to the Court that it "did not believe it advisable to begin retrieving and searching backup tapes" before the Court entered its order. (Dkt. No. 350 – Motion for Expedited Reconsideration).

201. Still further, LendingTree belatedly identified Chris Cox as a critical witness, forcing NexTag to divert resources from trial preparation to take his deposition. Feb. 3, 2014 Hrg. Tr. at 54:5-74:25 (characterizing Mr. Cox as a "critical witness"). However, LendingTree did not even call Mr. Cox as a witness.

202. LendingTree also belatedly identified Debra Ashley as a critical laches witness, again forcing NexTag to divert resources from trial preparation to take her deposition. Ms. Ashley testified that she was not contacted by LendingTree regarding the litigation until late January 2014, *after* LendingTree's disclosure of witnesses. Trial Tr. 1292:22-1293:22.

203. For the reasons set forth above, the balancing of the equities favors NexTag.

## FINDINGS OF FACT – EQUITABLE ESTOPPEL

1. The Court now turns to the issue of equitable estoppel and hereby incorporates the Findings of Fact and Conclusions of Law set forth above in the Laches discussion.

2. In November 1999, LendingTree approached NexTag about entering into a potential co-branding agreement. DX0540.

3. Beginning in 2002, NexTag was a Super Affiliate of LendingTree, meaning NexTag was driving traffic to LendingTree's website through NexTag's publicly available website, www.nextag.com. DX1483; Trial Tr. 1516:21-25 (Simmons Direct); 4309:22-4310:3 (Lebda Direct).

4. On October 31, 2002, GetSmart entered into an Online Advertising Agreement with NexTag to place advertisements on NexTag's publicly available website, www.nextag.com. DX1342.

5. NexTag launched its accused mortgage lead generation system in early 2003. NexTag's accused system was located on NexTag's publicly available website, www.nextag.com. Trial Tr. 1467:2-14 (Simmons Direct); DX1385.

6. On February 10, 2003, Home Loan Center entered into a participant Agreement with NexTag to provide mortgage leads from its accused service to Home Loan Center.

DX1235.

7. On May 5, 2003, LendingTree employees were aware of NexTag's accused system. DX1269.

8. On July 16, 2003, Home Loan Center entered into another Participant Agreement with NexTag to provide mortgage leads from its accused service to Home Loan Center. DX0987.

9. LendingTree acquired GetSmart in late 2003. DX1342. As part of the acquisition, LendingTree requested, and NexTag granted, consent to the assignment of the October 31, 2002, Online Advertising Agreement. *Id.*

10. On October 27, 2003, LendingTree's General Counsel and other key personnel were aware of NexTag's accused system. DX1350.

11. On November 7, 2003, LendingTree's CEO, Doug Lebda, was aware of NexTag's accused system. DX1305.

12. DX 1297, dated May 24, 2004, is another example of notice to LendingTree that NexTag could have been doing something more than just being LendingTree's affiliate. In DX 1297, LendingTree employee Lori Collins noticed that lenders were diversifying away from LendingTree. She raised this concern for discussion by top management. In response, LendingTree learned that other sources were becoming competitive with LendingTree. One of these sources was NexTag.

13. On August 31, 2004, LendingTree and NexTag entered into a Marketing and Technology Services Agreement to place advertisements on NexTag's publicly available website and drive traffic to LendingTree's website. DX1021

14. On September 8, 2004, LendingTree acquired Home Loan Center. Prior to this acquisition, LendingTree conducted due diligence on Home Loan Center's business, including review of Home Loan Center's contracts. Trial Tr. 1771:19-21 (Lebda Direct).

15. In 2005, LendingTree tracked its competitors in the mortgage lead business and had approximately fifty competitors. NexTag was one of these competitors. (PTX 981; PTX 982; March 12, 2014 a.m. Tr. at 4209:6-23, 4210:5-17.)

16. On October 7, 2005, Mr. Lebda sent a patent licensing letter to NexTag's CEO, Pernendu Ohja, offering to enter licensing discussions for the '594 and '816 patents. DX1024. The letter did not identify a specific NexTag product accused of infringement. The letter did not contain a specific charge of infringement against NexTag. Trial Tr. 2043:14-24 (Lebda Cross).

17. After October 7, 2005, Mr. Lebda never followed up on his letter to Mr. Ohja. Trial Tr. 2045:1-15 (D. Lebda Cross).

18. On November 22, 2005, LendingTree's Assistant General Counsel, Debra Ashley, sent a similar patent licensing letter to NexTag's general counsel, Greg Wharton, offering to enter licensing discussions for the '594 and '816 patents. DX472. The letter did not identify a specific NexTag product accused of infringement. The letter did not contain a specific charge of infringement against NexTag. Trial Tr. 1283:1-6 (Ashley Cross).

19. Ms. Ashley and Mr. Wharton had an email exchange between October 26, 2005 and December 13, 2005, regarding potential patent licensing discussions. DX1362. The parties did not exchange or discuss license terms at that time. The parties did not sign any non-disclosure agreement at that time.

20. After December 13, 2005, neither Ms. Ashley nor anyone else at LendingTree followed up with NexTag about a potential license to either the '594 or '816 patents. Trial Tr. 1284:18-21 (D. Ashley Cross).

21. On December 22, 2005, NexTag and Home Loan Center entered into another Participant Agreement for NexTag to provide mortgage leads from its accused service to Home Loan Center. DX1025.

22. LendingTree sued LowerMyBills for infringement of the '594 and '816 patent on April 13, 2005.

23. While the LowerMyBills litigation was pending, LendingTree did not notify NexTag that LendingTree intended to sue NexTag. Trial Tr. 1287:14-21 (Ashley Cross).

24. While the LowerMyBills litigation was pending, NexTag issued notices to its stock option holders which referenced LendingTree's suit against LowerMyBills. PTX1015; PTX1016; PTX1012; PTX1017; PTX1018; PTX1011; Trial Tr. 1552:17-1553:5; 1554:12-14 (Simmons Direct). This notice to its option holders included remote risks such as nuclear war, terrorism, and others. *Id.* NexTag did not disclose any actual notice of infringement from LendingTree, as no notice was given. Trial Tr. 1552:17-1553:5, 1557:6-15 (Simmons Direct).

25. LendingTree and LowerMyBills entered into a Settlement Agreement on July 31, 2007, ending the LowerMyBills litigation. LowerMyBills received a license to the '594 and '816 patents. DX0118.

26. After the LowerMyBills litigation concluded, LendingTree did not notify NexTag that LendingTree intended to sue NexTag. Trial Tr. 1287:14-21 (Ashley Cross).

27. After the LowerMyBills litigation concluded, NexTag did not disclose the possibility of a patent infringement suit brought against NexTag by LendingTree as a potential risk factor to its stock option holders. DX1498, DX1499.

28. On May 5, 2009, LendingTree and NexTag entered into a Master Agreement which provided for, among other things, NexTag selling mortgage leads from its accused system to LendingTree. DX0991, DX0992; Trial Tr. 1549:1-6 (Simmons Direct).

29. NexTag discontinued the accused system in middle of 2010, prior to LendingTree filing suit. Trial Tr. 1485:24-25, 1486-8-10 (Simmons Direct).

30. Home Loan Center purchased mortgage leads from NexTag's accused system from 2003 until NexTag discontinued the system in 2010. DX1263, DX1505.

## CONCLUSIONS OF LAW– EQUITABLE ESTOPPEL

Determining the applicability of equitable estoppel rests in the sound discretion of the trial court. *A.C. Aukerman*, 960 F.2d at 1028, 1041-42. Where equitable estoppel is established, all relief on a claim may be barred. *Id.*

Equitable estoppel has three elements: (1) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer; (2) the alleged infringer relies on that conduct; and (3) due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim. *Id.*

1. LendingTree's conduct spanning over a period of at least seven years misled NexTag into reasonably believing that LendingTree did not intend to enforce its patent against NexTag. NexTag relied on that conduct, and continued to sell leads to LendingTree and others.

55

2. By at least October 6, 2004, LendingTree believed that NexTag may be infringing its patents. PTX0995. Nonetheless, LendingTree made the tactical decision not to file suit against NexTag until September 8, 2010. Trial Tr. 1309:15-20; 1310:7-14 (Ashley Redirect).

3. Prior to filing this lawsuit, LendingTree never provided NexTag with actual notice of infringement. Trial Tr. 3575:14-15; 3961:20-21. The aforementioned licensing letters sent prior to filing this lawsuit do not constitute explicit, actual notice of infringement.

4. Rather, LendingTree's licensing letters sent in late 2005 were insufficient as a matter of law to provide NexTag with actual notice of infringement. *Amsted Indus. v. Buckeye Steel Castings, Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994) ("Actual notice requires the affirmative communication of a *specific* charge of infringement by a *specific* accused product or device.") (emphasis added); *see also Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001). Furthermore, the licensing letters were drafted specifically to avoid providing competitors with a specific charge of infringement so that competitors could not bring declaratory judgment actions against LendingTree. Trial Tr. 1312:11-15 (Ashley Redirect).

5. Because of the past relationship of the parties and their ongoing business agreements, LendingTree's failure to provide actual notice of infringement to NexTag led NexTag to reasonably believe that the licensing letters constituted offers to expand the parties' prior business relationship into new areas. Trial Tr. 1537:8-15; 1538:23-1539-4 (Simmons Direct). NexTag reasonably believed that an offer to expand the parties' prior business relationship meant that LendingTree did not intend to enforce either the '594 or the '816 patent against NexTag.

6.   LendingTree's failure to follow up on its licensing letters further led NexTag to reasonably believe that LendingTree did not intend to enforce either the '594 or the '816 patent against NexTag. Trial Tr. 1539:5-9; 1541:6-1542:4 (Simmons Direct).

7.   LendingTree's failure to notify NexTag during the LowerMyBills litigation that NexTag would be sued next led NexTag to reasonably believe that LendingTree did not intend to enforce either the '594 or the '816 patent against NexTag. Trial Tr. 1557:24-1558:11 (Simmons Direct). After the LowerMyBills litigation ended, NexTag did not continue to notify its stock option holders of the remote possibility of a patent infringement suit brought by LendingTree. Had NexTag believed that LendingTree intended to sue NexTag for patent infringement, NexTag's post-July 2007 stock option letters would have referenced such a suit. Trial Tr. 1557:24-1558:11; 1559:12-1560:21. The post-July 2007 stock option letters contained no such reference. DX1498; DX1499.

8.   NexTag relied on three aspects of LendingTree's misleading conduct in the course of operating the accused system from 2005 through 2010: (1) LendingTree's patent licensing letters offering to expand the parties' prior business relationship and not accusing NexTag of infringement; (2) LendingTree's failure to follow up on those letters; and (3) LendingTree's failure to provide NexTag notice during the LowerMyBills litigation that NexTag would be sued next.

9.   In reliance on LendingTree's misleading conduct, NexTag continued to sell mortgage leads from the accused system to LendingTree's subsidiary, Home Loan Center, including from 2005 through 2010.

10.  In reliance on LendingTree's misleading conduct, NexTag sold millions of mortgage leads

from the accused system to other companies from 2005 through 2010.

11. In reliance on LendingTree's misleading conduct, NexTag invested nearly $100 million dollars in advertising and marketing for its website, which included the accused system from 2003 through 2010.

12. If LendingTree is allowed to proceed with its claims, NexTag will be materially prejudiced for the reasons as set forth above in the Conclusions of Law – Laches.

13. Furthermore, LendingTree is claiming damages for sales of leads that NexTag made to Home Loan Center from 2005 through 2010. DX0567. Although LendingTree's damages expert, Cate Elsten, adjusted her calculations and removed sales made to Home Loan Center for 2004, she made no such adjustment for 2005 through 2010.

14. NexTag would not have made these sales to Home Loan Center had LendingTree accused NexTag of infringement instead of engaging in misleading conduct. Trial Tr. 1534:7-17; 1535:9-19 (Simmons Direct); 1585:23-1587:8 (Simmons Redirect). Allowing LendingTree to recover damages on these sales would materially prejudice NexTag.

15. For the reasons set forth above as well as those stated in the Conclusions of Law – Laches regarding balancing of the equities, the equities favor NexTag.

## CONCLUSION

In sum, looking to the totality of evidence presented, the Court finds it appropriate to limit LendingTree's damages based upon the principle of laches. Specifically, the Court finds that a presumption of laches is applicable in this case as LendingTree waited in excess of six years to file its lawsuit against Defendant NexTag after having constructive knowledge of NexTag's allegedly infringing activities. In light of the presumption of laches, the burden shifts

to LendingTree to show that its delay was reasonable and/or that no evidentiary or economic prejudice resulted from said delay. The Court concludes LendingTree fails on both counts. As such, the presumption of laches does not fall. Finally, the weight of the equities in this case supports application of the equitable doctrine of laches. Accordingly, LendingTree's pre-filing damages are barred. Similarly, considering the totality of the evidence presented, the Court concludes that LendingTree should be equitably estopped from recovering on its infringement claims against NexTag.

IT IS SO ORDERED.

Signed: March 31, 2014

Frank D. Whitney
Chief United States District Judge